**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEANETTE COLWELL,** | : | **No. 3:07cv502** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **RITE AID CORPORATION d/b/a** | : | |
| **RITE AID, and** | : | |
| **SUSAN CHAPMAN,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

Before the court are plaintiff's motion for partial summary judgment and defendants' motion for summary judgment.  Having been fully briefed and argued, the matters are ripe for disposition.

**Background**

The case concerns plaintiff's previous employment as a part-time cashier at Defendant Rite Aid Corporation's ("Rite Aid") Old Forge, Pennsylvania store. Defendants are the corporation that operates the Rite Aid chain of drug stores and Susan Chapman, the manager of the Old Forge store.  (Defendants' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment (Doc. 29) (hereinafter "Defendants' Statement") at ¶ 1).

Plaintiff applied for a position at the Old Forge store in April 2005.  (Id. at ¶ 2). During an interview, plaintiff informed Defendant Champman that she could not work between 3 and 5 pm during the week because she had to care for a granddaughter during those hours.  (Id. at ¶ 3).  When Chapman hired plaintiff, as a part time clerk,

she informed plaintiff that she could be scheduled for days, nights and weekends, depending on the store's needs.  (Id. at ¶¶ 4-5).

Plaintiff began work around April 25, 2005.  (Id. at ¶ 6).  Plaintiff worked different shifts, but mostly weekday evenings from 5 to 9 p.m., earning $5.25 an hour.  (Id. at ¶ 7).  Plaintiff's responsibilities at work included running the cash register, general customer service, and printing pictures from the photo machine. She did not have to drive as part of her job.  (Id. at ¶ 9).  Plaintiff adds that she had other duties than the defendants admit, including taking money orders, making copies, selling bus tickets, and cleaning the store in the evening.  (Answer to Defendants' Statement of Facts (Doc. 40) (hereinafter "Plaintiff's Answer") at ¶ 9. Plaintiff's job did not require her to drive at night, but she was required to drive when it was dark outside in order to arrive at work in the evenings.  (Defendants' Statement at ¶ 10; Plaintiff's Answer at ¶ 10).  While Rite Aid never formally evaluated plaintiff's job performance, she did receive recognition for fine customer service in the form of "reward cards."  (Defendants' Statement at ¶ 12).

Plaintiff's situation changed in summer 2005.  Around that time, a doctor diagnosed her with retinal vein occlusion and glaucoma in her left eye.  (Id. at ¶ 13). She became blind in that eye, though she could see perfectly well in the right eye. (Id. at ¶ 13-14).  Plaintiff's blindness in her left eye prevented her from driving at night.  (Id. at ¶ 15).  She also feels pressure in her eye and frequently uses eye drops to relieve it.  (Plaintiff's Response at ¶ 15).  Plaintiff's condition did not prevent

2

her from caring for herself, her eighty-nine-year-old mother and her eight year old granddaughter.  (Defendants' Statement at ¶ 16).  She was able to perform all of the functions of her job even after losing sight in the one eye.  (Id. at ¶ 17).  In her deposition, plaintiff reported that she could perform all of the functions of her job with her limited vision: "I could see perfectly well with my right eye and [was] perfectly capable of doing any duties that I was required to do, the only limitations was the night driving."  (Plaintiff's Deposition (Exh. B to Defendants' Motion for Summary Judgment) (Doc. 28-4) (hereinafter "Plaintiff's Dep.") at 85).  Plaintiff confirmed that she could "do all the functions of [her] job at Rite Aid once [she was] there."  (Id.).

In September 2005, plaintiff informed her supervisor, Chapman, of her vision problem.  (Defendants' Statement at ¶ 18).  She also told Chapman that she had difficulty driving at night.  (Id.).  She requested a change in her hours to accommodate this impairment.  (Id.).  Plaintiff denies that she requested a change in hours at this time.  (Plaintiff's Response at ¶ 18).  Chapman informed plaintiff that she could not give her exclusively daytime hours.  (Defendants' Statement at ¶ 19).

In late September or early October 2005, plaintiff provided Chapman a note from her doctor.  (Id. at ¶ 21).  The note stated "I recommend Ms. Jeanette Colwell not drive at night."  (Id.).  Plaintiff insists that she had raised this problem previously with Chapman.  (Plaintiff's Response at ¶ 20).  Plaintiff and Chapman discussed this problem.  (Defendants' Statement at ¶ 21).  Plaintiff told Chapman that she could get a ride to work from her son or grandson in the evenings.  (Id. at ¶ 22).  She testified

that she "never called off work.  When I was scheduled for a day, I would get there no matter how, if my sister would take me or drive me home because she lives" nearby.  (Plaintiff's Dep. at 159).  Assuming that the problem had been solved, Chapman scheduled plaintiff for nighttime work as needed by the store. (Defendants' Statement at ¶ 23).  Plaintiff testified that she never missed a day of work due to an inability to get to work.  (Id. at ¶ 24).  At the same time, however, plaintiff insists that having to work at night created a hardship for her and the family members who had to drive her to work.  (Plaintiff's Response at ¶ 24).  Plaintiff could not recall any other conversations with Chapman about this situation.  (Defendants' Statement at ¶ 25).

Plaintiff was apparently unsatisfied with this solution.  (Id. at ¶ 26).  She sought out Ken Karasek, her local representative in the United Food and Commercial Workers Union, and asked him for help in obtaining daytime work.  (Id. at ¶¶ 26-27).   Karasek arranged a meeting between plaintiff and Chapman.  (Id. at ¶ 28).  Chapman missed the meeting due to another commitment.  (Id. at ¶ 28).  The meeting was not held.  (Id.).  At that point, plaintiff resigned from Rite Aid.  (Id. at ¶ 29).  She had not attempted to reschedule the meet or contact anyone else about her situation.  (Id.).  Plaintiff contends that Chapman was at fault for her resignation, since Chapman did nothing to address the discrimination which plaintiff felt and described in her resignation letter.  (Plaintiff's Response at ¶ 29).  Defendants had not suggested she resign or threatened her employment in any way.  (Defendants'

Statement at ¶ 30).  Plaintiff contends that the mental distress caused by Chapman's treatment and indifference to her vision problems caused her to resign.  (Plaintiff's Response at ¶ 30).  She did not file for unemployment compensation benefits, she testified, because she had decided to leave on her own.  (Defendants' Statement at ¶ 31).  Plaintiff did not participate in any union or internal grievance procedure that contested her treatment.  (Id. at ¶ 32).

Plaintiff brought the instant action on March 16, 2007.  (Doc. 1).  The complaint raised three counts.  Count I raises a claim for disability discrimination because of a failure to accommodate and retaliation under the Americans with Disabilities Act (ADA) and the Pennsylvania Human Relations Act (PHRA) against Rite Aid.  Count II raises an age discrimination claim against Rite Aid under the Age Discrimination in Employment Act (ADEA) and the PHRA.   Count III raises a claim of individual liability under the PHRA against Defendant Champman, plaintiff's supervisor.

Defendants answered the complaint, and the parties engaged in discovery. After discovery closed, both sides filed motions for summary judgment.  The parties then briefed the issues, bringing the case to its present posture.

**Jurisdiction**

Because the case was brought pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq*, we have jurisdiction pursuant to 28 U.S.C. § 1331.   ("The

district courts shall have original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States.").   We have jurisdiction over

plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).   ("In any civil action of

which the district courts have original jurisdiction, the district courts shall have

supplemental jurisdiction over all other claims that are so related to claims in the

action within such original jurisdiction that they form part of the same case or

controversy under Article II of the United States Constitution.").

**Legal Standard**

This case is before the court pursuant to the parties' motions for summary

judgment.  Granting summary judgment is proper if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410

n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the

mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is

that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion.  International Raw

Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The

6

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477

U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit

under the governing law. <u>Id.</u>  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v.</u>

<u>Catrett</u>, 477 U.S. 317, 322 (1986).

**Discussion**

    **A.  Disability Discrimination**

    Under the ADA, an employer cannot discriminate against a qualified individual

with a disability because of her disability in regard to her employment. 42 U.S.C.A. §

12112 (a). Further, an employer must make reasonable accommodations to known

physical or mental limitations of an otherwise qualified employee with a disability

unless such employer can demonstrate the accommodation would impose an undue

hardship on the operation of the employer's business.   <u>Id.</u>  <u>See</u> <u>Taylor v.</u>

<u>Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999) (holding that

"[d]iscrimination under the ADA encompasses not only adverse actions motivated by

prejudice and fear of disabilities, but also includes failing to make reasonable

accommodations for a plaintiff's disabilities.").  Our analysis under the ADA applies

equally to plaintiff's claims under the PHRA. <u>See</u> <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102,

105 (3d Cir. 1996).

The plaintiff has the initial burden in an ADA matter of establishing a *prima facie* case. Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996); Newman v. GHS Osteopahtic, Inc., 60 F.3d 153, 157 (3d Cir. 1995). A *prima facie* case is established by the plaintiff when she demonstrates: 1)she is a disabled person within the meaning of the ADA; 2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and 3) she has suffered an otherwise adverse employment decision as a result of discrimination. Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996); Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998).

If the plaintiff meets this initial burden, the court then applies the next step in "the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805." Abramson v. William Patterson College, 260 F.3d 265, 281 (3d Cir. 2001). The burden of production shifts to the employer to "proffer a legitimate, non-discriminatory reason for the adverse employment decision." Id. at 282. An employer need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Pierske, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id. (emphasis in original). Once the

employer meets this burden, the plaintiff must show that a jury  "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action."  Id. at 764.

### i. Disparate Treatment

Defendants first contend that plaintiff cannot make out a *prima facie* case for disparate treatment discrimination because her disability–blindness in one eye that makes driving at night impossible–does not qualify as a disability under the ADA. Plaintiff testified at her deposition that she could perform major life activities despite her vision problems, and that the only limitation caused by her blindness was the inability to drive at night.  Since courts have found that the inability to drive at night does not constitute a disability, defendants contend, plaintiff is not disabled under the ADA.  Further, plaintiff has not established a record of a disability or introduced any facts by which a jury could conclude that her employers regarded her as disabled.  Plaintiff also cannot establish that she suffered any adverse employment action, disqualifying her from the protections of the Act.  Finally, plaintiff cannot prevail under her failure-to-accommodate claim even if she demonstrates that she is disabled, defendants argue, because they had no duty to accommodate her commute to work.

To qualify as a person with a disability under the meaning of the ADA, plaintiff must show that she has "'(A) a physical or mental impairment that substantially limits

9

one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment.'" Toyota Motor Manufacturing Kentucky, Inc. v. Williams, 534 U.S. 184, 193 (2001) (quoting 42 U.S.C. § 12102(2)).[1]  Defendants contend that plaintiff does not qualify for ADA protection under any of these three grounds.  The court will examine each in turn.

First, defendants contend that plaintiff does not suffer from an impairment that substantially limits a major life activity and is thus not disabled.  Under this portion of the statute, "the employee must show that she has an impairment, identify the life activity that she claims is limited by the impairment, and prove that the limitation is substantial."  Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 382 (3d Cir. 2004).  For a person to be substantially limited in a major life activity, she must be "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or

_____

[1]Plaintiff has provided the court with a copy of recent amendments to the ADA.  (See Doc. 48).  In those amendments, Congress specifically rejected limitations to the definition of a person with a disability adopted by the Supreme Court in a series of cases.  Congress listed as one of its objects a desire "(1) to carry out the ADA's objectives of providing 'a clear and comprehensive national mandate for the elimination of discrimination' and 'clear, strong, consistent, enforceable standards addressing discrimination' by reinstating a broad scope of protection to be available under the ADA."  S. Bill 3406, 110th Congress, 2nd Session § 2(b)(1).  The amendments are to become effective on January 1, 2009.  Id. at § 8.  The defendants contend that those amendments do not apply to this case, since the Congress did declare any intention to have them apply retroactively.  (See Doc. 49).  The court finds that even if these amendments were effective they would not have a material outcome on the case.  The plaintiff meets the definition of a person with a disability under the previous version of the act, and the amendments designed to expand that definition are immaterial.  The issue in this case is whether plaintiff can make out the rest of a prima facie case.  Whether she suffers from a disability is immaterial to those questions.

duration under which the average person in the general population can perform the same major life activity.'" <u>Gagliardo v. Connaught Labs</u>, 311 F.3d 565, 569 (3d Cir. 2002) (quoting 29 C.F.R. § 1630.2(j)).  Courts are to make an "individualized inquiry" into each plaintiff's limitations, because the ADA requires that a disability be established "'with respect to an individual.'" <u>Sutton v. United Air Lines</u>, 527 U.S. 471, 483 (1999).  Plaintiff argues that the blindness she suffers in her left eye represents a substantial limitation on her ability to see and she therefore qualifies for the protection of the act.

The ADA protects individuals with limited vision, but the United States Supreme Court has found that monocular vision does not qualify as a *per se* disability.  <u>Albertson's, Inc. v. Kirkingburg</u>, 527 U.S. 555, 566 (1999).  Undertaking the "individualized inquiry" required by the statute, the court found that monocular vision "may embrace a group whose members vary by the degree of visual acuity in the weaker eye, the age at which they suffered their vision loss, the extent of their compensating adjustments in visual techniques, and the ultimate scope of the restrictions on their visual ability."  <u>Id.</u>  Such monocular individuals must "prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial." <u>Id.</u> at 567.

Plaintiff contends that she suffered from a substantial limitation in her ability to see as a result of her left-eye problems.  Plaintiff testified that "I'm totally blind in my left eye."  (Plaintiff's dep. at 71).  She still experienced pain in her eye and put drops

in her eye to relieve the pressure "three, four times a day."  (Id. at 73).  She did not

experience a similar level of pain while working at Rite Aid (Id. at 74).  When asked

to describe the limitations imposed by her eye condition at her deposition, plaintiff

explained that "I [can] see perfectly well with my right eye and [am] perfectly capable

of doing any duties I was required to do, the only limitations was the night driving."

(Plaintiff's Dep., Exh. B to Defendants' Brief (Doc. 28-4) (hereinafter "Plaintiff's

Dep.") at 85).  Plaintiff blamed her inability to drive at night on her left-eye blindness.

(Id. at 86).  She testified that while driving at night "I get confused with the lights.  I

don't know where I am.  I can't tell if I'm on the right or what's on the right or left."

(Plaintiff's Dep. at 62).  The limitation on her driving was the only limitation plaintiff

claimed her monocular vision caused her.   (Id. at 86).  She could care for her eighty-

nine-year-old mother and ten-year-old granddaughter, as well as do her own

housework.  (Id.).

The court finds that plaintiff suffers from a disability within the meaning of the

ADA because of her monocular vision.  The evidence indicates that plaintiff

experiences substantial difficulties in depth perception and visual field as the result

of the blindness she suffers in one eye.  Plaintiff testified that when she attempts to

drive at night she cannot perceive whether cars are on her right or on her left.  Such

difficulties are evidence that plaintiff has substantial difficulties with depth perception.

Because the Supreme Court has emphasized that plaintiffs suffering from monocular

vision do not face an "onerous burden in trying to show they are disabled," the court

will find that plaintiff is disabled under the terms of the ADA.[2]  Albertson's, 527 U.S. at 567.

Though defendants deny that plaintiff is disabled within the meaning of the act, they also argue that even if the court finds that plaintiff is disabled, the court must conclude that plaintiff did not suffer an adverse employment action and therefore cannot make out a prima facie case.  Defendants contend that the only adverse employment action plaintiff claims is a constructive discharge, and the evidence indicates that she did not experience such a termination.

Courts employ an "objective test to determine whether an employee can recover on a claim of constructive discharge.'" Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001 ).  Courts must ask "'whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that  a reasonable person would have felt compelled to resign.'" Id. (quoting Connors v. Chrsyler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998)).  The focus in such cases is on a reasonable person, not on the complaining employee, since "'the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.'" Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1162 (3d Cir. 1993)

---

[2]Plaintiff submitted an affidavit executed after the summary judgment motions were filed in an attempt to bolster her claim that her monocular vision qualified her as disabled. (See Doc. 44).  The defendants filed a motion to strike the affidavit, arguing that it was untimely and contradicted plaintiff's earlier affidavit testimony.  (See Doc. 45).  Since the court has found that plaintiff is disabled within the meaning of the ADA without considering the affidavit, the court will deny the motion to strike as moot.

(quoting <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1083 (3d Cir. 1992)).

Among the situations courts consider as "indicative of constructive discharge" are

"(1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) a

demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable

position; (5) alteration of job responsibilities; (6) unsatisfactory job evaluations."

<u>Suders v. Easton</u>, 325 F.3d 432, 445 (3d Cir. 2003).  The Third Circuit has

emphasized, however, that this list is not exhaustive, and the absence of such

"factors . . . is not necessarily dispositive."   <u>Duffy</u>, 265 F.3d at 168.  The court has

held that to prove constructive discharge a plaintiff must show:  "(1) he or she

suffered harassment or discrimination so intolerable that a reasonable person in the

same position would have felt compelled to resign . . . and (2) the employee's

reaction to the workplace situation–that is, his or her decision to resign–was

reasonable given the totality of the circumstances."  <u>Suders</u>, 325 F.3d at 445.

     The court notes that none of the factors discussed by the Court of Appeals as

"indicative" of a constructive discharge are present here.  Defendants did not

threaten plaintiff with termination, and she was not encouraged to resign.

Defendants did not reduce plaintiff's pay or benefits or demote her.  Neither did

defendants transfer plaintiff to a less desirable job or alter her responsibilities.

Finally, defendants did not declare that plaintiff's performance was unsatisfactory.

Instead, they encouraged and rewarded her for good work by providing her with gift

cards.  As such, none of the types of evidence pointed to by the Court of Appeals as

strong indications of constructive discharge are present in this case.

Still, a jury could find constructive discharge even when these factors are absent.  "Constructive discharge may occur 'when the employer is aware that the employee has been subjected to a continuous pattern of harassment and the employer does nothing to stop it.'" Duffy, 265 F.3d at 168 (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084-85 (3d Cir. 1996)).   Further, even "a single, non-trivial incident of discrimination may be egregious enough to compel a reasonable person to resign." Id. at 169 n.2.  Plaintiff points to several incidents which she contends demonstrate that defendants subjected her to intolerable treatment while she worked for Rite Aid.  She alleges that Chapman, her manager, picked on her, forced her to work in a small, isolated area and ignored her. Chapman made disparaging comments about plaintiff, implying that she was slow and could not see.  Chapman did not allow plaintiff to perform jobs on the store floor, unlike her coworkers.  Such treatment, plaintiff reported, made her so upset and nervous that she began to suffer health problems.  Eventually, plaintiff concluded she had no choice but to resign.

The court finds that a juror could not conclude that a reasonable person would feel compelled to resign under the circumstances described by the plaintiff.  While the court recognizes that plaintiff was unhappy with her treatment and blamed it on Defendant Chapman's attitude towards her age and physical condition, the sorts of slights about which plaintiff complains are not so intolerable that an ordinary person

15

would feel compelled to resign.  Indeed, not being allowed to work in particular areas

of the store, not being included in conversations with coworkers and having a tense

relationship with a supervisor are not rare experiences for American workers.  The

Third Circuit Court of Appeals has noted that "employees are not guaranteed stress-

free environments and . . . discrimination laws 'cannot be transformed into a

palliative for every workplace grievance, real or imagined, by the simple expedient of

quitting.'" Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) (quoting

Gray, 957 F.2d at 1083).

Moreover, the evidence indicates that plaintiff quit her job shortly after she

realized that she had not been scheduled for daytime work, claiming she had been

discriminated against.  Plaintiff did not attempt to find a coworker with whom she

could switch shifts.  She did not appeal to higher levels of management.  Plaintiff did

contact a union representative, but when Chapman missed a meeting with plaintiff

and her union representative, plaintiff did not attempt to reschedule.  Instead, she

decided to quit.  She thus abandoned any effort to participate in the grievance

procedure available through the company and her union. The Court of Appeals has

found that  "in most situations, a prerequisite to a successful constructive discharge

claim is that the plaintiff attempted to explore alternatives before electing to resign."

Connors, 160 F.3d at 975.  The evidence indicates that plaintiff made no reasonable

effort to do so.  Accordingly, the court finds that she was not constructively

discharged.  Since plaintiff did not suffer any adverse employment action, she

cannot make out a prima facie case for disparate treatment under the ADA and the court will grant the motion for summary judgment on this claim.

### ii. Failure to Accommodate

Though plaintiff cannot demonstrate that she suffered from a constructive discharge and thus disparate treatment under the ADA, she also claims that defendants failed to accommodate her disability in violation of the Act.  "Under the ADA, discrimination includes: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]."  Walton v. Mental Health Ass'n, 168 F.3d 661, 670 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)).  To prevail on such a claim, a plaintiff must make "a prima facie showing . . . that a reasonable accommodation exists which would make her qualified."  Id.  Once plaintiff makes that showing, "the burden shifts to the defendant to prove either that the accommodation is unreasonable or that it creates an undue hardship for the defendant."  Id.  Here, defendants claim that they had no obligation to provide plaintiff with the accommodation she requested–daytime working hours–and therefore are entitled to summary judgment on plaintiff's accommodation claim.

The accommodation that plaintiff sought was a switch to daytime hours so that she could drive herself to work.  Federal regulations define reasonable

17

accommodations as "'modifications or adjustments *to the work environment*, or to *the manner or circumstances under which the position held or desired is customarily performed*, that enable a qualified individual with a disability to perform the essential functions of that position.'" Walton, 168 F.3d at 671 (quoting 29 C.F.R. § 1630.2(o)(1)(ii)) (emphasis added).  Several federal courts have found that the ADA and the regulations that implement it do not require an employer to provide an employee with an accommodation that facilitates her commute to work.  These courts have concluded that the ADA is designed to cover barriers to an employee's ability to work that exist inside the workplace, not difficulties over which the employer has no control.  See, e.g., LaResca v. American Telephone & Telegraph, 161 F. Supp. 2d 323, 334 (D. N.J. 2001) (finding that "under the Americans with Disabilities Act ("ADA"), activities such as commuting to and from work fall outside the scope of the job and are therefore not within the scope of an employer's obligations under the ADA."); Salmon v. Dade County School Board, 4 F. Supp. 2d 1157, 1163 (S.D. Fla. 1998) (finding that a school district did not have to transfer an employee to a school closer to her home to accommodate her back problems because "[w]hile an employer is required to provide reasonable accommodations to eliminate barriers *in* the work environment, an employer is not required to eliminate those barriers which exist *outside* the work environment."); Livingstone v. Fred Meyer Stores, Inc., 567 F. Supp. 2d 1265 (D. Ore. 2008).

Plaintiff argues that the court should not adopt the reasoning from these

cases, which have only persuasive authority on the court.  She contends that without

the ability to work during daylight hours she could not maintain her job, and that

other courts have found that employers have an obligation under the act to facilitate

an employee's ability to get to work.  See, e.g., Lyons v. Legal Aid Society, 68 F.3d

1512 (2d Cir. 1995).  Here, the parties agree that plaintiff did not need an

accommodation to perform her job once she arrived at work.  Her only difficulty

came in getting to work when it was too dark for her to drive and she could not find

anyone to give her a ride.  Thus, the accommodations that the plaintiff sought had

nothing to do with the work environment or the manner and circumstances under

which she performed her work. The court agrees with those courts which have found

that Congress intended to limit accommodations to ones at the workplace.  To rule

otherwise could make an employer responsible for how an employee gets to work, a

situation which expands the employer's responsibility beyond the ADA's intention.

This case is like Bull v. Coyner, No. 98cv7583, 2000 WL 224807 (N.D. Ill. Feb.

23, 2000).[3]  In that case, plaintiff suffered from retinitis pigmentosa, which rendered

him nearly blind and prevented him from driving at night.  Plaintiff had several

conflicts with his supervisor, who forbade his coworkers from giving him rides during

business hours and eventually transferred plaintiff to nighttime hours.  While the

court found the employer's action "insensitive and even malicious," the court also

found that "[a]ctivities which fall outside the scope of the job, like commuting to and

---

[3]The court recognizes that this case has only persuasive authority.

19

from the workplace, are not within the province of an employer's obligations under the ADA."  Id. at *9; see also Pagonakis v. Express, LLC, 534 F. Supp. 2d 453, 463 n.11 (D. Del. 2008) (finding that "[e]mployers are not required to grant accommodations to allow an employee to commute to work because the ADA solely address discrimination with respect to any 'terms, condition or privilege of employment.'") (quoting Bull, 2000 WL 224807 at *9).  The court therefore finds that defendants had no duty to accommodate the plaintiff in her commute to work. Summary judgment is therefore appropriate on this count.

## B.  Retaliation

Defendants also contend that plaintiff cannot prevail on her retaliation claim pursuant to the ADA.  In order to prevail on a retaliation claim, a plaintiff must first make out a prima facie case "that:  (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." Abramson v. William Patterson College, 260 F.3d 265, 286 (3d Cir. 2001).  Once plaintiff advances this case, the defendant must "advance a legitimate, non-discriminatory reason for its adverse employment action."  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).  This burden is not especially onerous: "it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action].  The defendant need not prove the articulated reason actually

20

motivated the action."  Id.  If the defendant meets this burden, then the plaintiff must

show "both that the employer's proffered explanation was false, and that retaliation

was the real reason for the adverse employment action."  Id. at 501.  As such, "[t]he

plaintiff must prove that retaliatory animus played a role in the employer's

decisionmaking process and (2) that it had a determinative effect on that process."

Id.

The dispute here is over whether plaintiff actually suffered any adverse

employment action.  Defendants contend that she did not, since plaintiff made a

request for a change in schedule and did not receive that change.  Therefore, they

argue, nothing about the terms of her employment changed and plaintiff cannot

make out a prima facie case for retaliation.

The parties disagree about the standard the court should apply in determining

whether plaintiff suffered an adverse employment action as a result of her request

for an accommodation due to her vision problems.  Defendants argue that plaintiff

must demonstrate that she suffered a "'significant change in employment status,

such as hiring, firing, failing to promote, reassignment, or a decision causing a

significant change in benefits.'" Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir.

2001) (quoting Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 749 (1998)).  Plaintiff

contends, however, that a more recent Supreme Court case requires only that she

"show that a reasonable employee would have found the challenged action

materially adverse, 'which in this context means it well might have 'dissuaded a

reasonable employee from making or supporting a charge of discrimination.'"

Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (quoting

Rochon v. Gonzalez, 438 F.3d 1211, 1219 (2006)).

In White, the Supreme Court explained that Ellerth, the case relied on by the

Third Circuit in Weston, did not address the retaliation provision of Title VII of the

Civil Rights Act of 1964, but instead addressed only "'a class of [hostile work

environment cases' in which an employer should be held vicariously liable." White

548 U.S. at 64 (quoting Ellerth, 524 U.S. at 760).  The case did not "discuss the

scope of the general antidiscrimination provision." Id. at 65.  The Court found that

the antidiscrimination provision under Title VII swept broader, and could include

actions that were "materially adverse" to a worker, even if they did not have a direct

impact on employment. Id. at 68.  Plaintiff seeks to apply that standard here.

The court finds that the defendants' actions would not make them liable for

retaliation even if we apply the standard articulated in White to this

case.  In White, the Supreme Court emphasized that courts should "separate

significant from trivial harms." Id. at 65.  While this Court recognizes that White

addressed Title VII, the court nevertheless finds that the defendants' actions

here–which amounted to not scheduling plaintiff for the daytime hours she

requested–would not have dissuaded a reasonable worker from seeking to

obtain her rights under the ADA.  The court has already found that Chapman's

behavior did not amount to a constructive discharge.  Further, a reasonable worker

22

would not be dissuaded from making a discrimination charge because her employer did not change her to a requested shift but instead kept her assigned to the job she had initially taken.

Indeed, the evidence does not indicate that defendants actually took any action–adverse or not–against the plaintiff after she requested daytime-only hours. No evidence indicates that defendants had planned to place plaintiff on daytime hours but changed their minds after plaintiff made her request. This case is not like Mondzelewski v. Pathmark Stores, 162 F.3d 778 (3d Cir. 1998), where the court found a jury could conclude that plaintiff had suffered retaliation when his employer changed his work assignment from a highly desirable shift to one typically regarded by workers as "punishment." Mondzelewski, 162 F.3d at 787. "Assigning an employee to an undesirable schedule," the court found, "can be more than a 'trivial' or minor change in the employee's working conditions." Id. at 788. Chapman did not *change* the plaintiff's work schedule or conditions in any way, and certainly did not assign her to a different, more onerous shift. Instead, she continued to schedule plaintiff as she had previously. No change in the conditions of employment occurred, and plaintiff therefore cannot argue that her statements provoked any action from the defendants. Retaliation cannot lie in these circumstances. If the court were to rule otherwise, any refusal to change an employee's schedule could give rise to a retaliation claim. The court will therefore grant the defendants summary judgment on plaintiff's retaliation claim under the ADA.

23

## C.  ADEA Claims

The Age Discrimination in Employment Act ("ADEA") prohibits "discrimination against an individual over age 40 with respect to 'compensation, terms, conditions, or privileges of employment, because of an individual's age.'" Billet v. Cigna Corp., 940 F.2d 812, 816 (3d Cir. 1991) (quoting 29 U.S.C. § 623(a)).  To recover under the act, "'a plaintiff must prove by a preponderance of the evidence that age was the determinative factor in the employer's decision' at issue." Id.  (quoting Bartek v. Urban Redevelopment Authority of Pittsburgh, 882 F.2d 739, 742 (3d Cir. 1989)).

A plaintiff can prevail on an ADEA claim by providing either direct or indirect evidence of age discrimination.   The court applies the same "direct evidence" test to claims of age discrimination that we do to claims of sex discrimination. See Glanzman, 391 F.3d at 512 (holding that in age discrimination cases, "if direct evidence is used, the proponent of the evidence must satisfy the test laid out in Price Waterhouse in order to prove a violation of the ADEA [citations omitted].).  "To be 'direct' for purposes of the Price Waterhouse test, evidence must be sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's age in reaching their decision. [citations omitted] ." Id.  In other words, a plaintiff "must produce evidence of discriminatory attitudes about age that were causally related to the decision to fire her." Id.

Plaintiff contends that she has direct evidence of age discrimination.  She cites comments by her supervisor, Chapman, that she was "slow."  Plaintiff assumed that

when Chapman called her slow, she was really complaining that she was old.

Further, plaintiff contends that Chapman treated workers not in the protected class

better than she treated her.  Chapman did not allow plaintiff the same opportunity to

do work on the sales floor as she did younger workers.  She also gave more

preferential assignments to younger workers, such as daytime hours.  Moreover,

Chapman got along better with the younger workers, talking and joking with them,

but ignoring the plaintiff.  Finally, Chapman forced plaintiff to provide documentation

for her eye injury, which plaintiff suspects came because Chapman did not believe

plaintiff's claims.  All of these incidents, plaintiff contends, are direct evidence of age

discrimination.

The court finds that a reasonable juror could not conclude that the cited

incidents constitute direct evidence of age discrimination.  At best, those incidents

are evidence that Champman did not treat plaintiff well and that she treated her

differently from other, younger workers.  Plaintiff has no evidence that anyone ever

directly expressed the idea that older people were unsuited to work at Rite Aid, or

that plaintiff's age motivated defendants' decision not to give her the hours she

requested.  Moreover, plaintiff does not present evidence that shows that defendants

ever articulated an animus towards plaintiff because of her age.  While plaintiff may

have assumed that "slow" meant "old," no evidence other than plaintiff's assumption

indicates that plaintiff's age was a concern to Chapman.  Indeed, plaintiff worked

only three months for the defendants, and they hired her when she was well within

the protected class.  A plaintiff might rely on such incidents in proving age

discrimination without direct evidence, but they do not represent the sort of

"circumstantial evidence . . . tied directly to the alleged discriminatory animus" that

would qualify as direct evidence.  <u>Ostrowski v. Atlantic Mutual Ins. Cos.</u>, 968 F.2d

171, 182 (3d Cir. 1992).  No reasonable juror could find that the statements "reflect a

discriminatory or retaliatory animus of the type complained of in the suit."  <u>Id.</u>  They

are thus not direct evidence of discrimination.

Lacking direct evidence of discrimination, a plaintiff seeking recovery under

the ADEA must first make out a prima facie case by "showing (1) he is within the

protected age class, i.e. over forty; (2) that he was qualified for the position at issue;

(3) he was dismissed despite being qualified; and (4) he was replaced by a person

sufficiently younger to permit an inference of age discrimination."  <u>Armruster v.</u>

<u>Unisys Corp.</u>, 32 F.3d 768, 777 (3d Cir. 1994).  Once the plaintiff establishes this

prima facie case, "the defendant has the burden of producing evidence that it had 'a

legitimate, nondiscriminatory reason for the discharge.'"  <u>Fakete v. Aetna, Inc.</u>, 308

F.3d 335, 338 (3d Cir. 2002).  If the defendant produces such evidence, the burden

shifts back to the plaintiff, who provide "evidence 'from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons[,] or (2)

believe that an invidious discriminatory reason was more likely than not a motivating

or determinative cause of the employer's action.'"  <u>Id.</u> (quoting <u>Fuentes v. Perskie</u>, 32

F.3d 759, 763 (3d Cir. 1994)).

Defendants argue that plaintiff cannot prevail on her ADEA claims because she cannot show that she suffered any adverse employment action.  Further, plaintiff was a member of the protected class when she was hired.  Defendants contend that she therefore cannot allege that she was the victim of employment discrimination when she later chose to leave the job.

For the reasons stated above in reference to plaintiff's ADA claims, the court concludes that plaintiff has not presented any evidence that she was the victim of an adverse employment action.  The terms of plaintiff's employment did not change, and she was not the subject of a constructive discharge.  Accordingly, plaintiff cannot make out a prima facie case under the ADEA.  The court will therefore grant summary judgment to the defendants on this count.

## Conclusion

For the reasons stated above, the court will grant the defendants' motion for summary judgment.  As the court has granted summary judgment to the defendants, plaintiff's motion for partial summary judgment is moot and will be denied.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEANETTE COLWELL,** | : | **No. 3:07cv502** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **RITE AID CORPORATION d/b/a** | : | |
| **RITE AID, and** | : | |
| **SUSAN CHAPMAN,** | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, to wit, this 27th day of October 2008, the defendants' motion

for summary judgment (Doc. 27) is hereby **GRANTED.** The plaintiff's partial motion

for summary judgment (Doc. 25) is hereby **DENIED**. The defendants' motion to

strike (Doc. 45) is hereby **DENIED** as moot. The Clerk of Court is directed to

**CLOSE** the case.

**BY THE COURT:**


**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**